And final case of the day, Ricardo McClinton v. Warden, Baldwin State Prison, Counselor Jarvis Primus et al., 24-10654. Thank you, John. Good morning. I'm Craig Jones. I had another argument with the other panel yesterday, so if I start talking about the wrong issues, please excuse me. But this is a prison murder case. I hope you were the appellee in that one and not the appellant. I was not, unfortunately. But that's okay. I work both ways sometimes. In fact, I was a shadow counsel for the police officers that sued the city of Atlanta, even though the plaintiff's bar doesn't know that. They do now. But anyway, I wanted to say that the law in this case was clearly established by the Rehnquist Court in a unanimous decision more than 30 years ago. And our expert witness for the plaintiff is the former number two at the Federal Bureau of Prisons. Now, I'm at your mercy. What issues do you want to hear about? Let me ask you a couple of questions about the statement of undisputed material fact of defendants and your response to it on two separate defendants. Am I correct that you concede that Defendant Abreu did not actually know that McClinton would face a risk of harm at Baldwin from retaliation due to his altercation with Johnson at Phillips? I'm not quite sure of the context there, but... Let me give you the context. Yeah. Defendant's statement of undisputed material fact stated that Abreu did not know that transferring McClinton to Baldwin State Prison would cause any risk of harm to McClinton. Plaintiff's response to this statement was to state that the statement was not controverted as stated, but controverted as to any implication that he had no duty to address security concerns based on knowledge. That was probably poor wording on my part, and I think it is addressed in the way you want to address it. But you did say it's not controverted, so under that, Abreu, right now, as it stands, you have conceded that Abreu did not know that transferring McClinton to Baldwin State Prison would cause any risk of harm to McClinton, correct? There's a... I would say no, because my understanding of their statement was that they were asking for direct proof of subjective knowledge. As you know, the standard here... So look, assuming that is correct, you're not contesting that, correct? I'm not. No, I'm not. I am contesting that. Even though, in your response, you said not contested. That was inadvertent. Well, let me move on to another defendant and address the similar problem. Defendant's statement of... This is as to Lieutenant Moss. Defendant's statement of undisputed material facts stated that Lieutenant Moss did not believe that McClinton would be in danger if he returned to his dorm because he stated that he no longer wanted protective custody and he wanted to return to his dorm. And your response was that the statement was not controverted because Moss did not take the required written statement or otherwise document the request in order to prove otherwise. It was not controverted? It says not controverted. Well, that's a typographical error. I mean, I think if you look at the context and the briefing as a whole, I think it's clear what argument is and we have preserved that. Well, but these statements are dealing with subjective knowledge and throughout your briefing, it's more should have known. And so, here the defendants are stating these defendants did not actually know. And it seems to me that you have not controverted that. Okay. Well, I disagree respectfully. Let me just say that it's a two-part standard. It's part objective. It's part subjective. The first part, the knowledge of the danger is objective. However, objective knowledge does not have to be proven by direct testimony. It can be proven by mission, and we do have some of those, particularly with respect to Warden Perry at the Phillips prison, but it can also be by direct evidence from other people. And direct testimony can also be by circumstantial evidence in which it can be inferred that the person actually did have knowledge, whether they say that they had knowledge or not. Can I, can I, I want to add... And whether they believe they have knowledge. And I mean that maybe what I controverted was a statement about their subjective belief. I think that's right, especially with regard to Lieutenant Moss. So, as I understand it, there isn't anything to controvert the testimony given that Judge Branch mentioned to you. What I understand your argument with Lieutenant Moss is, and correct me if I'm wrong, I don't want to miss the words in your mouth, is that he was at first told before the statement there that, and because he was referred by the other officer, you don't sue, that I'm afraid that there's someone in the dorm that I'm afraid of, and I'm seeking protection. And then later comes back and says it's all good, it's all okay, and then he gets sent back, right? Right. So, I believe, I believe that the second part of my statement that I don't, that I controvert that he followed the proper procedures is that implicit in that is the idea that you don't take the inmate's word for it. If they're aware of a risk, whether it's expressed by the inmate or whether they make an independent determination of that, if the inmate changes his mind, they still have a responsibility to protect that inmate. That's probably true as a matter of duty. Yes. And if we were just in straight tort, and certainly it's negligent not to follow policy that's there. But I guess the question that I have with regard to the follow-up to what Judge Branch asked you is, where the inmate does come, and after being given protection, because I understand that they then put him in sort of a separate cell at that point, or separated him, but at the point he then goes back and says, you know what, it's all good, I got it handled, everything's okay. How is the, how can we say that the officer is subjectively aware of a specific threat by a blood gang member at that particular dorm at Baldwin? Well, they were, they're required to document the request. They're also required to document the withdrawal. They didn't do that. Keep in mind that the second part of the standard, even though people confuse the language of McDade as somehow overruling a Supreme Court decision, which it explicitly reiterates, the standard is that if you show objectively that there was knowledge of a risk, either by circumstantial evidence, by admission, or by other testimony, that would be subjective, I'm sorry, subjective knowledge based upon circumstantial evidence, whether they admit to it or not. The second part of it is clearly objective. The part, they have a duty to respond reasonably to that knowledge. So, it might help if you give me about a minute to explain why I think each person, the standards met as to each defendant, and I won't do it in chronological order, I'll do it in the order of obviousness if I can, because I acknowledge the possibility that a jury could find some liable and others not liable, and the ignorance or lack of liability of one defendant may be hinging upon the fact that someone in the line before them didn't do their duty. But here it is. I think the most obvious, except to the jury, obviously, it could go either way, but the most obvious example of having subjective knowledge is Lieutenant Moss, because she was told of a risk, an inmate, and she had a duty to respond reasonably to that risk. The whole idea that people are arguing to you guys about criminal recklessness, that is not the second prong of the test. That is simply an analogy which is supposed to be a synonym for the deliberative difference itself, and the reason for that is that back in 1986, that was the first time the Supreme Court had ever used the term deliberative difference. Can I ask you a specific question about Lieutenant Moss? Yes. So, we have, so the issue that I have with Lieutenant Moss is, although McClinton had told Officer Milner that he needed to be removed from his assigned dorm because he did something to an offender at another institution and were in the same dorm together, there's no evidence that Milner communicated that information about the source of the threat to Moss. She did, because she had to— When Moss met with McClinton, he only told her that he wanted protective custody, not why he wanted it. Well, the— And then, McClinton said he could, that he could go back. Is that a, have you reviewed the deposition in its entirety, or are you just going by something that's cited in a brief? Because my understanding was that they, first of all, Moss— I'm going by all of the above. Lieutenant Milner followed the procedure. She went to the Director of Security, who was her supervisor, and she told him what happened. The supervisor, they actually put him in a holding cell for several hours, and then at some point, when she came back, he decided, never mind. And as an additional never mind, nothing gets you murdered in prison quicker than being a snitch. So, he may have decided, well, I don't want people to know that I ratted on this guy. Well, I'm not questioning his rational decision.  But in terms of deciding whether the, Lieutenant Moss had the actual awareness that her conduct resulted in the action here, resulted in the risk— Well, she's certainly closest in time, causally and temporally, because— I'm not talking about causation. I'm just talking about the subjective, her actual awareness. How could she be actually aware of a risk that there's an inmate who wants to cause him harm in the dorm, when the inmate specifically tells her, I'm okay, I don't need protective custody, send me back? Well, the problem is, the only person who knows the answer to that can't get his— I don't disagree with you, and these are tough cases for that reason. Right. But it needs to—there are reasonable inferences that can be drawn from that. And to the extent that any reasonable inference can be brought, inferred in favor of the plaintiff, that has to be what controls at the summary judgment stage. And there's other things, too. There's a lot of what ifs we don't know about. She could have looked—she could have pushed a button on the computer, and she would have seen that he was transferred there because he'd been in protective custody for four months, for four months, involuntarily, I might add. So it's not up to him. The inmates don't get to run the prison. If they get a whiff, if the staff gets a whiff, security is their thing. And if staff gets a whiff of a threat, there's a process they're required to go through. And she was told that there was a threat, whether it was specific or not. And she did that. She put him in the holding cell, and then while investigating, and then was told specifically, it's—I'm all good. It's okay. Send me back. But if she had acted reasonably as required by the former v. Brennan case, in response to what she did know, then she would have learned the other things. And— The problem, though, is you're talking about there are things that she should have learned and didn't. And we've got Wade and we've got Farmer telling us that we need to look at what Lieutenant Moss, in this case, had subjective knowledge of. No, that's—as the first part of it, as to whether there is knowledge of a risk, that can be proven. That has to be subjective. And it can be inferred by circumstantial evidence. In this case, she's got actual knowledge because she's been told. The reason one is part of it— There is a risk, and then she takes steps to protect him. And then he says, I'm good. I can go back. She doesn't take the required steps to protect him. She doesn't— Again, that's where you're moving into things she would have learned. The second—which is the second part of the standard. The second part of the standard is completely subjective. Now, let me explain to this. I was starting to say this a while ago about— about—well, Wade—Wade and McCabe reiterates the standard in Farmer. And that's because, over the years, what happened when the courts in the circuit would talk about deliberate indifference— And we made that very clear in our ombudsman decision. And there were some inconsistencies in the language. We've cleared it up. Right. Exactly. But the idea that criminal recklessness is required is not the second part of it. It's just—that is just the synonym for deliberate indifference. Because in 1994, when they decided the case in the Supreme Court, deliberate indifference had not been around that long. But everybody—I was in law school at Wake Forest. I was a charter member of the Federalist Society. And the syllabus for our criminal procedure class was the model penal code. And so the Farmer used the model penal code, which everybody was familiar with, deliberate indifference had only been around for a few years. So they used that to—as an analogy. But I'm going to— I know you have exceeded your time, but you do have three minutes for rebuttal. Okay. Please say something about that so I can rebut it. Thank you. Mr. Peters. Good morning, and may it please the Court. I'm Will Peters from the Georgia Department of Law. I represent the five prison officials. I speak for James Perry, Eladio Abreu, Jarvis Primus, Nolita Moss, and Walter Berry. There is no evidence showing that these defendants had actual knowledge that Jamari McClinton faced a substantial risk of serious harm after his transfer to Baldwin State Prison, let alone that any defendant acted with subjective criminal recklessness. More than that, the district court was absolutely correct on the issue of qualified immunity. Besides failing to prove an Eighth Amendment claim and deliberate indifference, the plaintiffs completely failed to meet their burden of showing that, beyond debate, the defendant's conduct in these circumstances violated clearly established law. I want to start with Warden James Perry. He was the warden of Phillips State Prison, where Jamari McClinton was housed before he was transferred to Baldwin. So in April 2021, Jamari McClinton attacks and stabs Michael Johnson, a gang member. McClinton was immediately placed in disciplinary segregation. Warden Perry kept McClinton in segregation for four months, for the rest of the time that he was at Phillips State Prison. And there were two reasons for that. The first was to prevent McClinton from attacking Michael Johnson a second time. Are you to agree that he is, that Warden Perry was subjectively aware of a serious risk to, uh, to Mr. McClinton? He was aware of a risk of harm at Phillips State Prison. That was a local risk, a specific threat from- Oh, we call it by the bloods. Was he aware of a specific threat by the bloods? By Michael Johnson and his affiliates at Phillips State Prison. His affiliates are the bloods, right? Yes. Right. And, and you agree that he put that in the transfer order, transfer him to a mental health Tier 3 facility, and he's leaving because of a problem he has with Michael Johnson of the blood gang, right? Yes. And you agree that there are, there's evidence, both from the expert and others, that it is not uncommon for one warden to tell another warden when there's a, what we'll call a problem prisoner coming their way, right? Yes. Okay. And then you agree that, at least with regard to Warden Perry, he testified that it certainly was possible knowing the prison system that there would be blood gang members in wherever he was being transferred to, right? He said it was possible, but that does not meet the subjective element of the defendant has to know that their own conduct causes substantial risk of serious harm. So, McClinton was in segregation for four months. You don't, but again, you don't think the prior acts and the transfer order indicate his subjective knowledge that he was at risk from the bloods, wherever that may be? It has to be specific, has to be dorm or prison specific? Well, he has to have the, the threat of harm here, it's a specific threat case from Michael Johnson, the inmate that he attacked at Phillips State Prison. If the warden does not have actual knowledge that that hit on his life or that threat had spread to other prisons, then he doesn't have actual knowledge of the substantial risk of serious harm. But counsel, the way that Wade tells us to look at it is to look at the conduct or the act or omission of the, of the person. The act or omission of the warden, of Warden Perry, is never going to be anything at Baldwin. He's not at Baldwin. It's always going to be his failure to do something, his omission of doing something, knowing of the risk. Here, it's the omission of making sure that he was separated from the bloods, or at least awareness of his threat from the bloods and the omission of doing that. To me, it seems the best case for the plaintiff is, with regard on subjective knowledge, is Warden Perry, but that you have a really good case on the objective prong because he seemed to have acted reasonably. He did separate him right away. He, not only did he transfer him, but he actually warned in the transfer paperwork, here's the issue, here's what's going on. Um, and, and then sort of sent him on his way. That, that seems to be reasonably responding to the risk as we've understood that. Is that, is that your argument or are you, are you just resting on the subjective prong? No, we were making both arguments that he doesn't have on the subjective prong actual knowledge of a substantial risk of serious harm at Baldwin State Prison, but if we move to the objective part, he acted reasonably. If that is enough, if you find that's enough on the subjective prong to give rise to actual knowledge of a substantial risk of serious harm, he put that information in the transfer paperwork, and the purpose of transferring him to another prison was to separate him from Michael Johnson, um, that known enemy, and as a matter of qualified immunity, there, uh, well, a word on qualified immunity, um, first, on summary judgment and on appeal, the plaintiffs make no effort at all to meet their burden of showing a violation of clearly established law. They don't cite any case that's materially similar to the facts in this case, and they've waived arguments on qualified immunity. But for Warden Perry, there's no case holding that Warden Perry can be held liable for criminal and unusual punishment for transferring McClinton to a new facility for the purpose of transferring him away from Jamari McClendon. But didn't the district court, didn't the district court address this in its dismissal order, which essentially said, assuming the fact that someone is subjectively aware of the risk that another prisoner is going to harm them, and assuming that nothing was done in result of it, so again, those are two things that may not happen here, but assuming those facts, our law is pretty clearly established under sort of a, a broadly held principle that that is a violation of the Eighth Amendment, right? I'm sorry, I misunderstood. Yeah, right, so under circumstances, remember, in the dismissal order, what the district court, the district court rightfully addressed qualified immunity, and what it says is the of risk from the bloods, and two, no reasonable response to that risk by any of the plaintiffs, and found no qualified immunity in the dismissal order because we have held as a broad principle that when those two things are together, that the failure to act reasonably in response to that risk is a violation of the Eighth Amendment. Is that wrong from the district court? On the, the order on the motion to dismiss? Right. Um, well, that's, that's not wrong, but I, I, I will say a word that. If that's not wrong, and I, I don't think it is, what I understand your opposing counsel to have done is say, listen, the facts I allege there are the facts that are brought out here. That may not be true. That's not correct at all. He didn't say that? He didn't, he didn't tell the district court that? No, no, he, yes, on summary judgment, on the issue of qualified immunity, he said that, his quote from the brief, qualified immunity is not an issue on summary judgment, and as the district court pointed out, we're not dealing with the assumed true allegations of the complaint. They weren't proven. What he said was, not that it's not an issue. What he said was, in fairness to him, is, is you've already decided this at the motion to dismiss stage. I've proven the facts, and so you don't have to redo that again. That, that's, that's what I understand him to have been arguing. Now, I think what the district court pointed out is, you're just wrong. The facts aren't what they were alleged. They're actually very different than what they were in the complaint. And so, I do need to go through a qualified immunity analysis, but that, that's not a waiver or a forfeiture, is it? Well, if, if they, on summary judgment, they don't deal with the facts that the record evidence on summary judgment, and don't cite any case that's factually similar, they haven't met their burden on qualified immunity. And there is no case in this circumstance where his response was reasonable, given the knowledge that he had. He knew that he attacked Michael Johnson, a gang member. He, it was, that was put in the transfer paper. And so, we should just, should we just rule there was no constitutional violation underway, right? Yes. For that reason. Yes. And moving on to Eladio Abreu, I think it's very important to understand what his position was at the Georgia Department of Corrections. He was a, a classification analyst. The classification analysts coordinate inmate transfers. He did not work at the prison facilities, right? He wasn't at Phillips, and he wasn't at Baldwin. He worked at a central office called Offender Administration. Didn't he testify, though, that the Bloods could have affiliation or members in all of the prisons? Yes, he testified that. Right. And, and it's at least a fair inference that he looked at the, the transfer order that was sent by, by Ward and Perry, right? Yes. Given that, is that not some evidence of subjective knowledge? And I'm, the testimony I'm pointing to is his transcript, Docket Entry 57 and 34. Um, right. So, Abreu, Abreu approved the transfer to Baldwin State Prison. So, the transfer request said that McClinton had a known enemy and that, um, McClinton could not come out on the compound, meaning at Phillips State Prison. And that, that only tells Abreu. From the, from the Blood gang. Um, from. Of the Blood gang. It says a high-ranking gang member. I don't believe the transfer request itself said the Bloods gang. Okay. Um, I apologize. I'm incorrect on that. It said a high-ranking Blood gang member. But. Right. This, the case law is clear here that mere knowledge of gang activity alone at prisons, that's generalized awareness of a risk of harm. He has transfer paperwork here that says. He didn't say that. I think he said the Bloods, that they could have members at all of the prisons. Yes, but that would be the same as the case law that says gang activity at prisons, knowledge of that is not actual knowledge of a substantial risk of serious harm. It has to be the specific threat, right? He has paperwork saying that he can't come out on the compound. Isn't the order the specific? So you have a general. I agree with you that if the testimony was simply there could be gang members at all the facilities, that would be sort of be unconnected. But at the point at which we acknowledge that he reviewed the transfer order and that order says that this guy got into an altercation with a high-ranking member of the Blood gang, here and I'm transferring him for that reason. Isn't that the point at which that becomes awareness that he, this guy's a threat of the Bloods are going to threaten him or he's a threat. He poses, the Bloods pose a threat to him. Sorry. No, I don't think that's a reasonable inference that can be drawn from that. That he's attacked a high-ranking Blood gang member at this prison. He'd be at a risk at that prison. So we transfer him away from that prison. That does not mean that that inmate is at risk at all other prison facilities. There would have to be some other fact. You'd have to know that that threat had spread to other prison facilities. But that's where his testimony comes in, where he says, I quoted it to you, that the Bloods could have a presence at all of the prisons, including the one he was transferred to. So doesn't that make him, doesn't that get her close to subjective awareness at that point? No, the knowledge that there are Bloods at other prisons doesn't mean that that threat from that specific inmate is transferred to the other prisons. That was the admitted fact. On, in the amended complaint, it was alleged that all defendants had actual knowledge of a gang-related murder-for-hire plot that had been transmitted to all other prisons. And it was admitted on summary judgment that no defendant had knowledge that that threat or hit had spread to other prison facilities. So that is the specific threat. We didn't talk about this with your opposing counsel. Abreu was one of the added defendants in the amended complaint, right? Yes. And so that creates, that, he falls within the statute of limitations issue that the district court raised, right? For the wrongful death claim. Only for the wrongful death claim, not for the estate claim? Not for the estate claim. Because the estate claim has the tolling provision associated with it.  Okay, thank you. And, I mean, I wanted to go back to Abreu's role, right? He was a medical and mental health classification analyst. That was his responsibility, was to process transfers for inmates requiring medical or mental health services. Jamari McClinton was a mental health level three inmate. He got him transferred to a facility where he was placed in a dorm that could provide mental health level three services. That's a dorm that provides mental health assistance. And on the issue of qualified immunity, there's no clearly established law that could have I want to move on to Nolita Moss. So, she was a lieutenant at Baldwin State Prison. On August 9th or 10th, 2021, a day or two before McClinton was murdered, McClinton told Officer Crystal Milner, who was not sued, that he wanted to leave the dorm because, quote, he did something to an offender at another institute and they were in the same dorm together. Judge Branch asked your opposing counsel whether that was communicated to Lieutenant Moss. What does the record say about that? Right. That's Officer Milner's deposition at page 36. Milner testified, quote, I gave her his name and I stated that he said he needs to leave the dorm. That's it. And Lieutenant Moss directed Milner to send him over to security. Once at security, McClinton said that he wanted protective custody. He didn't tell her why he wanted protective custody. And later he withdrew that request and said he was going to be okay. That's corroborated by Milner, who said that she was on a 6 a.m. to 6 p.m. shift. She was leaving the facility while he's being transported back to the dorm. And she said, you're going back to the dorm. And he said, I'm going to be okay. On the issue, the law is crystal clear in this circuit that an inmate merely telling an officer that they feel threatened or that they want protective custody is not enough to give that officer actual knowledge of a substantial risk of serious harm. And that's Marbury, right? That's in the Marbury, yes. Took the words right out of my mouth. And they, the appellants contend that Lieutenant Moss was required, as a matter of the Eighth Amendment law, that once he said, I want protective custody, they have to keep him in protective custody until a full-scale investigation is completed. That's been rejected by the circuit. And there's a good, as my colleague mentioned here, there's a good reason for that rule is that inmates cannot have control over their own dorm placement if they are dissatisfied with their dorm or their cellmate. You can't have an Eighth Amendment rule that says that I want protective custody and then you get to be transferred to a different dorm. There has to be more. There has to be facts that would allow the officer to conclude that the inmate faced a substantial risk of serious harm. And the additional fact here that he withdrew that request for protective custody is critical. And I see that I'm running out of time here. I would say in closing that the evidence does not support a deliberate indifference claim and the defendants are entitled to qualified immunity and this court should affirm. Thank you. Mr. Jones, you have three minutes. Thank you. If I could, I was getting ready to read the definition of criminal recklessness under the Model Penal Code, which is directly referred to by Farmer. And it says, a person acts recklessly with respect to a material element of offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from misconduct. The risk must be such of nature and degree that considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation. And based upon that definition of criminal recklessness, which all lawyers knew at the time, that deliberate indifference was something new, they said that it's analogous to that. And based upon that, this is how the Farmer court worded the issue. It says that, I'm going to read it straight from the seat, the prison official may be held liable under the Eighth Amendment for acting with deliberate indifference to inmate health or safety only if he knows that inmates face a substantial risk of serious harm. And they go on to say that that can be inferred from circumstantial evidence. And it says they know of a substantial risk and they disregard that risk by failing to take reasonable measures to abate it. So, we're also entitled on summary judgment to inferences about whether the response to the risk, even if the risk is only established by circumstantial evidence, if there's a jury question as to the existence of the risk, then there's also a jury question as to whether they responded reasonably to it. And if you think about the analogy of a slip-and-fall case, as Judge Branch, presiding Judge Branch, you talked about what they should have done. That would be considered constructive knowledge. You know, if you can show a substance on the floor in a grocery store and you can show that it's been there for a certain period of time, that puts constructive notice on the storekeeper. However, if you've got the passage of time and you've got an employee over here stocking themselves 10 feet away who's in a position where they could have seen it, then that's not constructive knowledge. That's circumstantial evidence of actual knowledge. And that's really what we're dealing here with. And I think what's happened is I think y'all did the right thing with waiving the date. Keep in mind, though, it's a medical case and not a failure to protect case. And in a medical scenario, the officer is not going to have a full appreciation for what's a significant medical problem because they're not medically trained, but they are experts in security. And so I think what's happened is people took it because you imposed a higher level of culpability in that case. People are taking that and they're trying to say, well, not only does it have to be astronomical risk, but the response has to be criminally reckless. And I don't think that's y'all's intent and I don't think certainly wasn't the Supreme Court's intent. You've exceeded your time. Thank you very much. Thank you both. We have your case under advisement and we are in recess until tomorrow morning.